**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
　　　　jsmith@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES RAAYMAKERS, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>WESTERN DIGITAL CORPORATION,<br><br>　　　　　　　　　　　　Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff James Raaymakers ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Western Digital Corporation ("Western Digital" or "Defendant") for the manufacture, marketing, and sale of Western Digital Hard Drive products identified below.  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF ACTION**

1.      This is a class action against Defendant Western Digital Corporation for the manufacture and sale of 2TB, 3TB, 4TB and 6TB capacity WD Red NAS hard drives (the "WD Red Drives" or the "Product").

2.      All of the WD Red Drives were specifically marketed and advertised to be suitable to use in Network Attached Storage systems ("NAS" or "NAS system") and in a Redundant Array of Independent Disks ("RAID" or "RAID array").  And indeed, the WD Red Drives *used to be* suitable for this purpose.

3.      However, in 2018, Western Digital secretly substituted Shingled Magnetic Recording ("SMR") technology in place of the higher-performance Conventional Magnetic Recording ("CMR") technology in the WD Red Drives.  As detailed herein, while CMR technology is appropriate for use in NAS systems and RAID arrays, SMR technology is wholly inappropriate for use in these systems.  Thus, the WD Red Drives are unfit for their intended purpose, and actually put consumers at a higher risk of losing and/or destroying data.

4.      Defendant switched over to SMR technology because it makes the WD Red Drives cheaper to manufacture.  However, Defendant has put its profits before the interests of consumers. For instance, consumers who are using the Product for its advertised purpose—in NAS and RAID formats—have experienced extremely slow performance and a significantly higher risk of data loss.  Further, implementing even a single WD Red Drive to in an existing RAID array utilizing that does not use SMR technology—as it should not be—will poison the entire drive array.  This will result in both inferior performance as well as a significantly increased risk of data loss.

5.      Further, despite the technological downgrade, the pricing for the WD Red Drives has remained the same.  In this regard, Defendant was able to increase its profits by reducing its costs of goods sold while still bringing in the same amount of revenue for each of the WD Red Drives sold.

6.      Had Defendant disclosed that the WD Red Drives use SMR technology, Plaintiff and putative Class members would not have purchased the WD Red Drives, or would have paid less for the WD Red Drives than they did.

7.      Plaintiff and Class members were accordingly injured by the price premium they paid for inferior hard drives.

8.      Plaintiff brings this action individually and on behalf of a class of all other similarly situated purchasers to recover damages and restitution for:  (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq.*; (ii) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210; (iii) breach of implied warranty; (iv) breach of implied warranty under the Song-Beverly Act, Cal. Civ. Code §§ 1790, *et seq.*, and California Commercial Code § 2314, (v) violation of California's False Advertising Law ("FAL"), Cal. Bus & Prof Code § 17500, (vi) fraud, and (vii) breach of express warranty.

**PARTIES**

9.      Plaintiff James Raaymakers is a citizen of California who resides in Sacramento County.  In or about May 2020, Mr. Raaymakers purchased one 3.5" 6 terabyte WD Red NAS hard drive from an online retailer from his residence in Sacramento for approximately $179.99, plus $15.75 in sales tax for a total of $195.74.  Mr. Raaymakers was looking was a hard drive to use as a back-up for his home computing system.  When deciding which hard drive to purchase, Mr. Raaymakers was particularly concerned with hard drive performance.  Accordingly, Mr. Raaymakers sought out a NAS drive because those drives are designed offer faster performance. Mr. Raaymakers selected the WD Red Drive because it was advertised as being "built for NAS compatibility," "purpose-built for NAS," "specifically designed for use in NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID environment," and that the Product is appropriate for "small and home office NAS systems in a 24x7 environment."  Mr.

Raaymakers relied on these representations and warranties in deciding to purchase the WD Red Drive, and these representations and warranties were part of the basis of the bargain.  Moreover, prior to purchase, Mr. Raaymakers carefully reviewed the labeling on his WD Red Drive's packaging, and saw no representations that the WD Red Drives use SMR technology, which makes the WD Red Drives slower and offer worse data protection.  Had Defendant disclosed that the WD Red Drives use SMR technology, making the WD Red Drives slower and offer worse data protection, Mr. Raaymakers would have been aware of that fact and would not have purchased a WD Red Drive at all, or would have only been willing to pay a substantially reduced price for the WD Red Drive.  Mr. Raaymakers used the WD Red Drive as directed, but encountered a number of problems.  The WD Red Drive continuously disconnected from Mr. Raaymakers' server.  And when Mr. Raaymakers tried to back up his data to the WD Red Drive, the WD Red Drive took two days before finally stalling out and failing to back up his data.  By comparison, Mr. Raaymakers owns a drive that uses CMR technology, and has been successfully able to back up his data to the CMR drive in a matter of hours.

10.     Defendant Western Digital Corporation is a Delaware corporation with its principal place of business and/or nerve center located at 5601 Great Oaks Parkway, San Jose, California 95119.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COMMON FACTUAL ALLEGATIONS

### I.   OVERVIEW OF HARD DRIVE TECHNOLOGY

14.    A hard drive disk ("HDD") is a form of magnetic mass storage.  Each hard drive contains a stack of circular plates of magnetic material called "platters," divided into billions of tiny areas called "bits" that can be independently magnetized (to store a 1) or demagnetized (to store a 0).  Data is "read" (retrieved) or "written" (recorded) onto an HDD by converting strings of bits into electrical current fed through an electromagnet that changes the magnetization of each bit. Once the information is written onto the HDD, the HDD uses a magnetic reader to turn the data back into a useful form (the file to be stored or retrieved), much like a record player's needle translates a record's grooves into music.[1]

15.    To store the amount of data that HDDs store today, the HDDs must contain billions of bits.  Thus, "areal density" comes into play, which is the number of bits of data that can be recorded onto a platter and is measured by the number of bits or gigabits (one billion bits) per square inch.  Higher areal density values allow for greater storage using the same amount of disk space.[2]

16.    There are several methods that exist to read and write data to HDDs and maximize areal density.  The first of these is Perpendicular or Conventional Magnetic Recording ("CMR"). CMR "works by aligning the poles of the magnetic elements, which represent bits of data,

---

[1] Kanawat Senanan, *How do Hard Drives Work?*, TED-ED, https://www.youtube.com/watch?v=wteUW2sL7bc (last accessed June 11, 2020); How a Hard Disk Drive Works, SEAGATE, https://www.youtube.com/watch?v=NtPc0jI21i0 (last accessed June 12, 2020).
[2] *What are PMR and SMR Hard Disk Drives?*, SYNOLOGY, https://www.synology.com/en-us/knowledgebase/DSM/tutorial/Storage/PMR_SMR_hard_disk_drives (last accessed June 11, 2020).

perpendicularly to the surface of the disk.  Magnetic tracks are written side-by-side, without overlapping."[3]



17.     CMR HDDs "deliver excellent random-access performance," and are as such "widely used not only in PCs but also for online storage applications."[4]  CMR is used in most standard HDDs.[5]

18.     Another method of reading and writing data is Shingled Magnetic Recording ("SMR").  "Rather than writing each magnetic track without overlapping, SMR overlaps each new track with part of the previously written track, much like shingles on a roof.  By overlapping the tracks, write heads become thinner, thus expanding areal density."[6]

[3] *Id.*
[4] Shimomura Kazuhito, *Shingled Magnetic Recording Technologies for Large-Capacity Hard Disk Drives*, 1 Toshiba Review Global Edition 33, 33 (2015), https://www.toshiba.co.jp/tech/review/en/01_02/pdf/a08.pdf (last accessed June 11, 2020).
[5] Joel Hruska, *Western Digital, Seagate Are Shipping Slow SMR Drives Without Informing Customers: Reports*, ExtremeTech, Apr. 14, 2020, https://www.extremetech.com/computing/309389-western-digital-seagate-reportedly-shipping-slow-smr-drives-without-informing-customers (last accessed June 11, 2020)
[6] *What are PMR and SMR Hard Disk Drives?*, Synology.



the width of write head
the width of read head

19.     SMR thus allows for low-cost, high-capacity HDDs.[7]  "However, if new (or modified) data needs to be placed near existing data, the drive will have to overwrite the neighboring shingled tracks … That makes [SMR] drive[s] significantly slower at writing tasks, especially for random writes."[8]

20.     In addition, the design of SMR drives makes permanent data loss more likely. Whereas data engineers can rebuild certain components on other storage types and recover lost data, the SMR data translators cannot be repaired.  This can result in permanent data loss if the translators are damaged.[9]

21.     In short, while SMR HDDs boast high areal density, they are at a disadvantage in nearly every other category.[10]  For these reasons, SMR HDDs are typically only used "for cold data storage, like archives and backups, because of their poor performance,"[11] and are typically marked

---

[7] *Shingled Magnetic Recording Technologies for Large-Capacity Hard Disk Drives*, 1 TOSHIBA REVIEW GLOBAL EDITION at 33.

[8] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure*, TOM'S HARDWARE, Apr. 14, 2020, https://www.tomshardware.com/news/wd-fesses-up-some-red-hdds-use-slow-smr-tech (last accessed June 12, 2020).

[9] David Blizzard, *WD Shingled Magnetic Recording – New Road Blocks For Data Recovery Pros*, BLIZZARD DATA RECOVERY, https://www.blizzarddr.com/wd-smr-translation-new-road-blocks/ (last accessed June 12, 2020).

[10] Joel Hruska, *Western Digital, Seagate Are Shipping Slow SMR Drives Without Informing Customers: Reports*.

[11] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure*.

as "archival" to designate the use of the technology.[12] SMR HDDs are not recommended for use by the ordinary consumer.[13]

22.     The use of SMR technology is particularly problematic for NAS systems and RAID arrays. "A NAS system is a storage device connected to a network that allows storage and retrieval of data from a centralized location for authorized network users and heterogeneous clients." In other words, a NAS system "is like having a private cloud in the office," except that all files are stored locally on several small hard drives instead of remotely on someone else's server.[14]

23.     A NAS system has a number of advantages to typical cloud storage. For one, all files are stored locally while still being accessible remotely, instead of on someone else's server. Further, setting up a NAS system is a one-time payment (paying once per HDD), as opposed to paying monthly for cloud storage. NAS systems also offer faster performance because files do not need to be uploaded to or downloaded from the cloud; they can be accessed instantly.[15]

24.     NAS systems also offer better data protection through "redundancy." Redundancy "means that one hard drive can mirror another inside the NAS, so whatever [is] store[d] on one drive, it is simultaneously stored on the other, like a live instant back-up. This means that if one drive does fail, then [a consumer] can carry on as if nothing happened" because the data is stored on another HDD in the NAS system, and the consumer can simply get a new HDD to replace the failed one.[16]

25.     A RAID array "combine[s] multiple, less-expensive drives into a single, higher-capacity and/or faster volume" that "facilitate[s] redundancy."[17] A RAID array is not the same

---

[12] Jim Salter, *Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR*, ARS TECHNICA, Apr. 17, 2020, https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/ (last accessed June 12, 2020).
[13] *Id.*
[14] *What is NAS (Network Attached Storage) and Why is NAS Important for Small Businesses?*, SEAGATE, https://www.seagate.com/tech-insights/what-is-nas-master-ti/ (last accessed June 18, 2020).
[15] STILL CONFUSED ABOUT NAS? NAS EXPLAINED IN 3 MINUTES, https://www.youtube.com/watch?v=k13sQxybqiA (last accessed June 18, 2020) (Western Digital promotional video).
[16] *Id.*
[17] Jon L. Jacobi, *RAID Made Easy*, PCWORLD, Apr. 19, 2012, https://www.pcworld.com/article/194360/raid-made-easy.html (last accessed June 18, 2020).

technology as a NAS system, but the two overlap.  A NAS system is often made up of HDDs configured into a RAID array, and a RAID array allows a NAS system to offer redundancy and high performance.[18]

26.     There are several common types of RAID arrays.  RAID 0 focuses on high performance and employs a process known as "striping."  Striping distributes data across multiple drives (for example, block A goes to and from drive 1, block B goes to and from drive 2), which permits increased write and read speeds."[19]  In other words, "when the system wants to read that data, it can do so simultaneously from all the disks and join them together to reconstruct the entire data stream."[20]

**RAID 0**

| | |
|---|---|
| Block 1 | Block 2 |
| Block 3 | Block 4 |
| Block 5 | Block 6 |
| Block 7 | Block 8 |
| **DISK 1** | **DISK 2** |

27.     RAID 1 uses the concept of "data mirroring," which clones data "to an identical set of disks so that if one of the disks fails, the other can be used.  It also improves read performance since different blocks can be accessed from all the disks simultaneously."[21]  This allows for the aforementioned "redundancy."  If a new drive is added to the RAID array, data can be replicated from the old HDDs to the new one in a process called "resilvering."

[18] Pedro Hernandez, *NAS vs. Raid: How They Differ and Overlap*, ENTERPRISE STORAGE, May 4. 2018, https://www.enterprisestorageforum.com/storage-networking/raid-vs-nas-how-they-differ-and-overlap.html (last accessed June 18, 2020).
[19] Jon L. Jacobi, *RAID Made Easy*.
[20] Anirban Das, RAID Levels 0, 1, 4, 5, 6, 10 Explained, Booelan World, https://www.booleanworld.com/raid-levels-explained/ (last accessed June 18, 2020).
[21] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



28.     Finally, RAID 5 combines "the speeds of RAID 0 and data protection of RAID 1 into one configuration and is by far the most commonly used RAID level" in businesses and NAS systems.[22]  "RAID 5 writes data to and reads from multiple disks, and it distributes parity data across all the disks in the array.  Parity data is a smaller amount of data derived mathematically from a larger set that can accurately describe that larger amount of data, and thus serves to restore it.  Since parity information is distributed across all the drives, any drive can fail without causing the entire array to fail."[23]

---

[22] Nathaniel Cooper, *The Best RAID for NAS – Networking, Storage and Overlap*, PROMAX MEDIA TECHNOLOGY SOLUTIONS, Sept. 25, 2019, https://www.promax.com/blog/best-raid-for-nas-storage-overlap (last accessed June 18, 2020).
[23] Jon L. Jacobi, *RAID Made Easy*.



29.    The bottom line is that NAS systems and RAID arrays focus on providing high performance and data protection.  Accordingly, an HDD marketed for NAS systems (and, by extension, use in a RAID array) should offer the same traits.  For this reason, an HDD that uses SMR technology is inappropriate for use in a NAS system or a RAID array because SMR does not offer high performance or data protection.

30.    Many have noted the ill effects of using a SMR drive in a NAS system or RAID array.  SMR HDDs take longer to rebuild RAID arrays and have slower random write speeds than CMR HDDs.[24]  Further, if an SMR drive is used in a RAID array that otherwise uses CMR technology, "the overall read/write performance may be affected by the SMR ones during the overwriting tasks."[25]  And even if a RAID array is built only out of SMR HDDs—which it shouldn't be—the SMR HDDs must be connected in a very specific way.  Otherwise, read/write times can extend far beyond OS and application timeouts, causing hangs and even data loss, much like an individual SMR device."[26]  Finally, Seagate, one of the largest manufacturers of HDDs, has publicly stated that they "don't recommend SMR for NAS."[27]

---

[24] Jim Salter, *We Put Western Digital's Dreaded SMR Red Drive to the Test*, ARSTECHNICA, June 5, 2020, https://arstechnica.com/gadgets/2020/06/western-digitals-smr-disks-arent-great-but-theyre-not-garbage/ (last accessed June 18, 2020).
[25] *What are PMR and SMR Hard Disk Drives?*, SYNOLOGY.
[26] MICROSEMI, USING SMR DRIVES WITH SMART STORAGE STACK-BASED HBA AND RAID SOLUTIONS 2 (2017), https://adaptec.com/nr/pdfs/microsemi_adaptec_smr_whitepaper_cn.pdf (last accessed June 18, 2020).
[27] Jim Salter, *Seagate Says Network Attached Storage and SMR Don't Mix*, ARSTECHNICA, Apr. 21, 2020, https://arstechnica.com/information-technology/2020/04/seagate-says-network-attached-

## II.     WESTERN DIGITAL'S FRAUDULENT REPRESENTATIONS AND OMISSIONS

31.     Western Digital is one of the largest computer HDD manufacturers in the United States.

32.     Western Digital markets its hard drives series by color.  The WD Red Drives are "built to withstand the challenges of the always-on NAS environment."[28]  Western Digital markets the WD Red Drives as "purpose-built to balance performance and reliability in NAS and RAID environments."[29]  To that end, WD Red Drives even include "NAS" in their name:



33.     When Defendant first released the WD Red Drives in 2012, these representations regarding NAS, performance, and reliability may have been true.  That is because the WD Red Drives initially used CMR technology.

34.     Upon information and belief, however, Defendant secretly implemented SMR technology into its WD Red Drives started in 2018.  Yet, Defendant continued to advertise the WD

storage-and-smr-dont-mix/ (last accessed June 18, 2020) (quoting Seagate Corporate Communications lead Greg Belloni).
[28] Eric Hamilton, *WD Blue vs. Black vs. Red & Purple HDD & SSD Differences (2017)*, GAMERS NEXUS, Feb. 8, 2017, https://www.gamersnexus.net/guides/2796-wd-blue-vs-black-vs-red-in-2017 (last accessed June 12, 2020).
[29] WD RED NAS HARD DRIVE, https://shop.westerndigital.com/products/internal-drives/wd-red-sata-hdd#WD20EFRX (last accessed June 18, 2020).

Red Drives as built for NAS systems, despite the fact that SMR technology is not recommended for NAS systems for the reasons stated above.

35.     In or about mid-2019, skilled technologists began to suspect Western Digital was sneaking SMR technology into their WD Red Drives after noticing slower performance.[30]  But Western Digital nonetheless denied that it was using SMR technology in its WD Red Drives.  As late as March 2020, Yemi Elegunde, an enterprise and channel sales manager for Western Digital UK claimed:

> "The only SMR drive that Western Digital will have in production is our 20TB hard enterprise hard drives and even these will not be rolled out into the channel.  <u>All of our current range of hard drives are based on CMR Conventional Magnetic Recording.</u>  With SMR Western Digital would make it very clear as that format of hard drive requires a lot of technological tweaks in customer systems."[31]

36.     The average consumer was not aware that the WD Red Drives utilized SMR technology.  Only Western Digital knew definitively that the WD Red Drives use SMR technology.

37.     In April 2020, Western Digital admitted the WD Red Drive use SMR technology[32]:



[30] Patrick Kennedy, *WD Red DM-SMR Update:  3 Vendors Bail and WD Knew of ZFS Issues*, SERVE THE HOME, June 14, 2020, https://www.servethehome.com/wd-red-dm-smr-update-3-vendors-bail-and-wd-knew-of-zfs-issues/ (last accessed June 18, 2020).

[31] Jim Salter, *Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR* (emphasis added).

[32] Paul Alcorn, *WD Sets the Record Straight: Lists All Drives that Use Slower SMR Tech*, TOM'S HARDWARE, Apr. 23, 2020, https://www.tomshardware.com/news/wd-lists-all-drives-slower-smr-techNOLOGY (last accessed June 12, 2020).

38.     Consumers have excoriated Western Digital for sneaking SMR technology into its WD Red Drives, and for the myriad problems such deception has caused consumers:

- "The TLDR I got from this whole situation is that WD Red are no longer generally NAS drives, they are 'Archival Drives' … A consumer should be able to trust a drive is suitable for the purpose it's marketed.  They should drop the label NAS or be sued."[33]

- "Have they completely lost their mind now.  Selling SMR drives for NAS usage.  And there was 0 mention, that they are SMR drives, not even in their data sheets.  Those lying misleading data destroying monsters at WD."[34]

- "[A] NAS drive with SMR is most certainly not fit for purpose.  SMR should not have been put in these drives, period."[35]

- "'WD Red NAS – False Advertising'"[36]

- "I find the lack of disclosure … disturbing."[37]

- "I have been wondering for weeks why my NAS was super slow, averaging 30MB/s-40MB/s transfer over gigabit ethernet.  But no wonder one of my drive is an [SMR] one!"[38]

- "I've bought WD Red drives in the past but I'd be hesitant to do so again if they're going to pull stunts like this."[39]

---

[33] FYI – WESTERN DIGITAL SMR HDDs, REDDIT, https://www.reddit.com/r/DataHoarder/comments/g7m542/fyi_western_digital_smr_hdds/ (last accessed June 15, 2020).
[34] Id.
[35] WD SUPPORT HAS REFUSED TO REPLACE MY WD RED SMR 6TB DRIVES WITH NON-SMR EQUIVALENTS, REDDIT, https://www.reddit.com/r/DataHoarder/comments/g7k5qv/wd_support_has_refused_to_replace_my_wd_red_smr/ (last accessed June 18, 2020).
[36] Id.
[37] COMMENTS TO BUYER BEWARE—THAT 2TB-6TB "NAS" DRIVE YOU'VE BEEN EYEING MIGHT BE SMR, https://arstechnica.com/gadgets/2020/04/caveat-emptor-smr-disks-are-being-submarined-into-unexpected-channels/?comments=1 (last accessed June 18, 2020).
[38] Id.
[39] Id.

- "SMR drives have their place.  The problem arrives when they are not labeled as archival storage and you expect them to be normal drives with normal characteristics."[40]

- "Bad show, WD.  They need to [j]ust tell us the specs and let us make an informed decision. It feels WD is hiding info here <u>because they know it's important and will negatively influence the purchasing decision</u>.  That's not the kind of company I'm going to trust with my important data.  As a customer, I'm really disappointed."[41]

39.     Further, even though SMR HDDs are cheaper to produce, Western Digital is not passing those savings onto consumers.[42]  Western Digital is still pricing the WD Red drives using SMR (in the below screenshot, the EFAX HDD) roughly the same as those WD Red drives that use CMR (in the below screenshot, the EFRX HDD)[43]:



40.     Moreover, despite the belated disclosure that the WD Red Drives use SMR technology, Defendant still labels the WD Red Drives as "NAS" and maintains the same

---

[40] *Id.*
[41] *Id.* (emphasis added).
[42] Paul Alcorn, *Western Digital Fesses Up: Some Red HDDs Use Slow SMR Tech Without Disclosure.*
[43] Jim Salter, *Buyer Beware—That 2TB-6TB "NAS" Drive You've Been Eyeing Might be SMR.*

representations on its website that the WD Red Drives are "purpose-built to balance performance and reliability in NAS and RAID environments."

41.     In short, Plaintiff and Class members who purchased the WD Red Drives were not told that the WD Red Drives use SMR technology, which affects drive performance and data stability.  Western Digital failed to disclose anywhere that the WD Red Drives utilize SMR technology.  It does not appear on the WD Red Drives' packaging, on Defendant's website, or the websites of other major retailers.  Quite the contrary, Western Digital affirmatively represented to consumers that the WD Red Drives were built for NAS and RAID, when the use of SMR technology made the WD Red Drives unsuited for these purposes.  These consumers paid a price premium for drives they believed used CMR technology, which offers better performance.  Had Western Digital disclosed that the WD Red Drives use SMR technology, Plaintiff and Class members would have been aware of this material fact and consequently would not have purchased the WD Red Drives, or would have paid less for the WD Red Drives.

## CLASS REPRESENTATION ALLEGATIONS

42.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the WD Red Drives (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

43.     Plaintiff also seeks to represent a subclass of all Class Members who purchased the WD Red Drives in the State of California (the "Subclass").  Excluded from the Class are persons who made such purchases for purpose of resale.

44.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

45.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" and "Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendant's Products, Plaintiff believes that Class and Subclass members are so numerous that joinder of all members is impracticable.

46.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b) whether Defendant's conduct was unfair and/or deceptive;

(c) whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiff and the Class;

(d) whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

47.     With respect to the Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated the California Consumer Legal Remedies Act as well as California's False Advertising Law and Unfair Competition Law.

48.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendant's Product, and Plaintiff sustained damages from Defendant's wrongful conduct.

49.     Plaintiff will fairly and adequately protect the interests of the Class and Subclass and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the Subclass.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

51.     The prosecution of separate actions by members of the Class and the Subclasses would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the

interests of the Class and the Subclasses even where certain Class or Subclass members are not parties to such actions.

**CAUSES OF ACTION**

**COUNT I**
**Violation of California's Consumers Legal Remedies Act,**
**California Civil Code § 1750, *et seq.***
**(Injunctive Relief Only)**

52.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

53.    Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against Defendant.

54.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

55.    Defendant violated Civil Code § 1770(a)(5), (a)(7) and (a)(9) by holding out the Product as "built for NAS compatibility," "purpose-built for NAS," "purpose-built to balance performance and reliability in NAS and RAID environments," "specifically designed for use in NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID environment," and that the Product is appropriate for "small and home office NAS systems in a 24x7 environment," when in fact the Product utilized inferior SMR technology rendering them unsuitable and dangerous for use in NAS or RAID environments.

56.    As for omissions, Defendant at all relevant times had a duty to disclose its use of this inferior technology in the Product because, inter alia: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiff and the Class; (b) Defendant concealed material information from Plaintiff and the Class; and/or (c) Defendant made partial

representations which were false and misleading absent the omitted information.

57.     Defendant's misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

58.     Defendant made partial representations to Plaintiff and class members, while suppressing the Defect.  Specifically, by displaying the product and describing its features, the product packaging and Defendant's website implied that the product was suitable for use in NAS and RAID environments, without disclosing that the Product actually uses inferior technology rendering them unsuitable for their stated purpose.

59.     Plaintiff and the members of the Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid.

60.     On June 16, 2020, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code §1782(a).  The letter also provided notice of breach of express and implied warranties.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.

61.     Plaintiff and the Subclass members seek only injunctive relief under the CLRA at this time.

**COUNT II**
**Violation California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200-17210**
**(Injunctive Relief Only)**

62.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

63.     Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against Defendant.

64.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

65.     Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

66.     Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

67.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Product is likely to deceive reasonable consumers.

68.     Defendant's acts and practices described above also violate the UCL's proscription against engaging in unfair conduct.

69.     Plaintiff and the other Subclass members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the nature of the Product, or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled Product.

70.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Product.

71.     Plaintiff and the other Subclass members had no way of reasonably knowing that the Product they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

72.     The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the Subclass.

73.     Pursuant to California Business and Professional Code § 17203, Plaintiff seeks only injunctive relief at this time.

**COUNT III**
**Breach of Implied Warranty**

74.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

75.     Plaintiff brings this claim individually and on behalf of members of the Class and Subclass against Defendant.

76.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the WD Red Drives were suited for use in NAS systems and RAID arrays. Defendant breached the warranty implied in the contract for the sale of the WD Red Drives because the WD Red Drives could not "pass without objection in the trade under the contract description," the WD Red Drives were not "of fair average quality within the description," the WD Red Drives were not "adequately contained, packaged, and labeled as the agreement may require," and the WD Red Drives did not "conform to the promise or affirmations of fact made on the container or label."  *See* U.C.C. § 2-314(2) (listing requirements for merchantability).  As a result, Plaintiff and the Class Members and Subclass Members did not receive the goods as impliedly warranted by Defendant to be merchantable.

77.     Plaintiff and the Class Members and Subclass Members purchased the WD Red Drives in reliance upon Defendant's skill and judgment in properly packaging and labeling the WD Red Drives.

78.     The Products were not altered by Plaintiff and the Class Members and Subclass Members.

79.     The Products were not fit for their intended purpose when they left the exclusive control of Defendant.

80.     Defendant knew that the WD Red Drives would be purchased and used without additional testing by Plaintiff and the Class Members and Subclass Members.

81.     The WD Red Drives were defectively designed and unfit for their intended purpose, and Plaintiff and the Class Members and Subclass Members did not receive the WD Red Drives as warranted.

82.     Plaintiff and Class Members and Subclass Members were injured as a direct and proximate result of Defendant's breach because (i) they would not have purchased the WD Red Drives if they had known that it utilized inferior SMR technology and is therefore unsuitable for its stated and advertised purpose for use in a NAS system or RAID array, and (ii) they overpaid for the WD Red Drives on account of its misrepresentations that it is "built for NAS compatibility," "purpose-built for NAS," "purpose-built to balance performance and reliability in NAS and RAID environments," "specifically designed for use in NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID environment," and that the Product is appropriate for "small and home office NAS systems in a 24x7 environment."

**COUNT IV**
**Breach of Implied Warranty Under the Song-Beverly Act,**
**Cal. Civ. Code §§ 1790 *et seq*. and California Commercial Code § 2314**

83.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

84.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

85.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, et seq., and California Commercial Code § 2314, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose (here, to be used as dehumidifiers) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

86.     The Product at issue here is a "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

87.     Plaintiff and the Class Members and Subclass Members who purchased one or more of the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

88.     Defendant is in the business of manufacturing, assembling, producing and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

89.     Defendant sells its products through a network of authorized and certified dealers. Defendant has entered into various contractual agreements with its dealers.  The dealers were not the intended beneficiaries of the warranties associated with the Product.  Plaintiff and the Class Members and Subclass Members were the intended beneficiaries of the warranties associated with the Product.

90.     Defendant impliedly warranted to retail buyers that the Product were merchantable in that they would:  (i) pass without objection in the trade or industry under the contract description, and (ii) were fit for the ordinary purposes for which the Products are used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Product would not pass without objection in the trade or industry under its description, and was not fit for its ordinary purpose for which it is used.

91.     Plaintiff and the Class Members and Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

92.     The Product was not altered by Plaintiff or the Class Members or Subclass Members.

93.     The Product was defective at the time of sale when they left the exclusive control of Defendant.

94.     Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

95.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and the Class Members and Subclass Members have been injured and harmed because

they would not have purchased the Product if they knew the truth about the Product, namely, that they were unfit for use as in NAS and RAID environments.

**COUNT V**
**Violations of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500**

96.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

97.    Plaintiff brings this cause of action individually and on behalf of the proposed Class and Subclass.

98.    As alleged more fully above, Defendant has both falsely advertised the Product and omitted/concealed from consumers material information about the true nature of the Product.

99.    Plaintiff and the other members of the Class and Subclass have suffered injury in fact and have lost money or property as a result of Defendant's violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

**COUNT VI**
**Fraud**

100.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

101.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendant.

102.    As discussed above, Defendant misrepresented that the Product is "built for NAS compatibility," "purpose-built for NAS," "purpose-built to balance performance and reliability in NAS and RAID environments," "specifically designed for use in NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID environment," and that the Product is appropriate for "small and home office NAS systems in a 24x7 environment."

103.    Defendant has also omitted material information from consumers about the true nature of the Product, namely, that they are unsuitable for their principle and advertised purpose because the Product utilizes inferior SMR technology.

104.    The false and misleading representations and omissions were made with knowledge of their falsehood.  Defendant is a top distributor of hard drive products in the United States who

perpetrated this fraudulent scheme with the intent to deceive consumers by not informing consumers that the Product actually utilizes inferior SMR technology, rendering the Product unable to perform its advertised purpose. Nonetheless, Defendant continues to sell the Product to unsuspecting consumers.

105.    The false and misleading representations and omissions were made by Defendant, upon which Plaintiff and members of the proposed Class and New York Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and to purchase the Product.

106.    The fraudulent actions of Defendant caused damage to Plaintiff and members of the proposed Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

<u>COUNT VII</u>
**Breach Of Express Warranty**

107.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

108.    Plaintiff brings this claim individually and on behalf of members of the Class and Subclasses against Defendant.

109.    In connection with the sale of the Product, Defendant, as the designer, manufacturer, marketers, distributor, and/or seller issued written warranties by representing that the Product is "built for NAS compatibility," "purpose-built for NAS," "purpose-built to balance performance and reliability in NAS and RAID environments," "specifically designed for use in NAS systems with up to 8 bays," "helps ensure your data is protected … in a NAS or RAID environment," and that the Product is appropriate for "small and home office NAS systems in a 24x7 environment."

110.    In fact, the Product does not conform to the above-referenced representations because it utilized inferior SMR technology.

111.    Plaintiff and Class members were injured as a direct and proximate result of Defendant's breaches because they would not have purchased the Product if they had known that the Product did not work as warranted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the nationwide Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

(b)     For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff, the nationwide Class, and the Subclass on all counts asserted herein;

(d)     For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For pre-judgment interest on all amounts awarded;

(f)     For an order of injunctive relief;

(g)     For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated:  June 19, 2020                                    Respectfully submitted,

                                                    **BURSOR & FISHER, P.A.**

                                              By:     */s/ L. Timothy Fisher*
                                                      L. Timothy Fisher

                                            L. Timothy Fisher (State Bar No. 191626)
                                            Joel D. Smith (State Bar No. 244902)
                                            1990 North California Blvd., Suite 940
                                            Walnut Creek, CA 94596

Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
          jsmith@bursor.com

*Counsel for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff in this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that the Defendant's principal place of business is in the Northern District of California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 19th day of June, 2020.


_     /s/ L. Timothy Fisher     _
L. Timothy Fisher